Leona Briske, Appellee, v. Village of Burnham, et al., Appellants.

Gen. No. 41,376.

Opinion filed February 26, 1941.

WINSTON, STRAWN & SHAW, of Chicago, for certain appellants; GEORGE B. CHRISTENSEN and DOUGLAS C. MOIR, both of Chicago, of counsel.

MARKMAN, DONOVAN & SULLIVAN, of Chicago, for certain other appellant; SAMUEL K. MARKMAN and JOHN A. O'NEIL, of Chicago, of counsel.

H. MEYER SIMBORG and EARL J. WALKER, both of Chicago, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

At about 9 p. m. on September 21, 1935, plaintiff was injured when the automobile in which she was riding struck a barricade across vacated Entre avenue in the Village of Burnham, Cook county, Illinois. Entre avenue is also known as Center avenue. At the time of the accident plaintiff was 16 years and 10 months of age. She was then unmarried and her name was Leona Briske. Since the accident she married and her name is now Leona Ostrowski. In due time she filed her complaint in the circuit court of Cook county, and after a trial before the court and a jury a judgment for $3,000 was entered against the Village of Burnham, a municipal corporation, New York, Chicago & St. Louis Railroad Company, a corporation, and Baltimore & Ohio Chicago Terminal Railroad

Company, a corporation. We will speak of the Village of Burnham as the Village, the New York, Chicago & St. Louis Railroad Company as the Nickel Plate and the Baltimore & Ohio Chicago Terminal Railroad Company as the B. & O. C. T. The defendants prosecute this appeal for the purpose of reviewing the judgment, and ask that a judgment be rendered here against the plaintiff, or in the alternative that a new trial be directed.

On the evening of the accident, Stanley Jakubcyk, the owner of a Ford automobile, accompanied by a friend, Casimer Francus, called at the home of plaintiff in Calumet city, and they decided to go to a ballroom in Hegewisch to spend the evening. A girl named Ann Warchol accompanied them. Stanley drove and plaintiff sat on the front seat to his right. Casimer and Ann sat on the rear seat. They drove north on Burnham avenue until they reached Pullman avenue, which runs northwest, and drove northwest on Pullman avenue until it intersected what was formerly known as Entre avenue. They turned northeast on what was formerly Entre avenue, intending to drive thereon about 1 block across the rights of way of the B. & O. C. T. and Nickel Plate to Brainard avenue, and to turn northwest on Brainard avenue. It is admitted that the accident occurred on what was formerly Entre avenue in the Village of Burnham at a point where Entre avenue intersects the railroad tracks. On August 12, 1931, the Village passed an ordinance vacating Entre avenue from Pullman to Brainard avenue. The ordinance was to become effective when it was recorded in the office of the recorder of deeds of Cook county and when Burnham avenue was opened to public travel. Both of these conditions were complied with. A certified copy of the ordinance was recorded on April 22, 1933, and Burnham avenue was opened for public travel on December 20, 1933. After the latter date Entre avenue between Pullman avenue

and Brainard avenue was no longer a public street in the Village, and from that time on the Village had no jurisdiction or control over the maintenance or up-keep of the vacated street. Thereafter, that portion of what was formerly Entre avenue became private property. Thus, the accident happened nearly 2 years after the street was vacated and turned over to the railroads. The action of the Village in vacating that portion of the highway was taken as a part of a plan of extending and improving certain highways, which was approved by the Commerce Commission of the State of Illinois. This approval was necessary because the railroads involved had to relocate some of their tracks. One of the conditions under which the plan submitted to the Commerce Commission was approved was that the portion of Entre avenue heretofore mentioned should be closed for public use as soon as the Burnham avenue crossing should be opened for public use. The railroads paid the Village for the land which was taken. Prior to December 20, 1933, Entre avenue had been frequently used by motorists driving north into Hegewisch and Chicago. Stanley Jakubcyk had occasionally used Entre avenue prior to that time, but not thereafter. He had no knowledge or information that there had been any change in the street or railroad crossings. About 125 feet northeast of Pullman avenue, the B. & O. C. T. maintains a switch track running parallel with Pullman avenue, adjoining which track on the northwest side thereof was a regular cross buck warning signal. A barricade extends across the vacated street 200 feet northeast of Pullman avenue and about 50 feet northeast of the B. & O. C. T. property, and the tracks of the Nickel Plate were 50 feet beyond, or northeast of the barricade. The barricade consisted of a solid rail, suspended across the roadway of what was formerly Entre avenue, about 3½ or 4 feet above the ground. This rail was held in place by 4 or 5 uprights driven into the pavement. The rail was

painted in alternate black and white stripes. On top of the barricade at the center was a red reflector, which witnesses variously described as 6 inches, 8 inches and 1 foot square. There was no evidence as to when the barricade was erected, or who erected it. Stanley Jakubcyk testified that when he turned the automobile from Pullman avenue into Entre avenue, he observed that it appeared to be paved in the usual manner; that he also observed the railroad crossarm sign of the type customarily used at railroad crossings over public highways; that as the car passed the railroad crossarm sign both he and plaintiff looked up and down the tracks of the B. & O. C. T. for the purpose of observing whether any trains were approaching; that suddenly the automobile struck the obstruction, or barricade. Plaintiff was thrown violently forward against the windshield and sustained injuries to her head, back and right ankle. She was knocked unconscious and suffered a concussion of the brain. There was a long cut on the face across the nose and eye, requiring 9 stitches. Although her physician recommended that she stay at the hospital, she was taken home where she remained in bed for 2 months. Plaintiff was the only occupant of the car who was seriously injured. Casimer Francus testified that he did not observe or know of the obstruction before striking it. He also testified that the lights on the automobile were lit. The weather was clear. Jakubcyk, the driver, stated that after crossing the B. & O. C. T. tracks, he did not see anything; that "everything just went black in front of me. After that we hit the barricade." The headlights showed a distance of 200 feet ahead.

Defendants argue that the proximate cause of the accident was the negligence of the driver, the presence of the barricade being a condition and not a proximate cause. They also contend that they were not guilty of any negligence or other breach of duty. It will be remembered that the driver claimed that as he ap-

proached the barricade he was looking for trains along the switch track of the B. & O. C. T. After he crossed the B. & O. C. T., he had to travel an additional 65 feet before striking the barricade. The evidence discloses that the headlights showed objects 200 feet ahead. The reflector on the barricade was 3 or 4 feet above the pavement. The headlights on the automobile were also above the pavement. Had the driver paid attention to his driving and observed the condition of the roadway in front of him, he would have stopped before striking the barricade. As stated in *Dee v. City of Peru,* 343 Ill. 36, 42, ''The law will not tolerate the absurdity of permitting one to testify that he looked and did not see the danger when the view was unobstructed, and where, if he had properly exercised his sight, he would have seen it.'' The presence of the barricade did no more than furnish a condition by which the injury was made possible. The proximate cause of the injury, however, was the negligence of the driver. For that reason, as a matter of law, none of the defendants is liable.

The Village asserts the separate defense that after the street was vacated it became private property and the Village was no longer charged with the maintenance and upkeep thereof, and is not liable for any injuries which occurred thereon. We agree with the position taken by the Village. It is true that the street as vacated retained the appearance of a public street. The Village had no right to obstruct the railroads' access to the property that had formerly been a street. These railroads have the right to permit persons who desire to do business with them to enter upon their property. Clearly, the Village cannot be held liable because the railroad companies placed a barricade across their property. The place where the barricade was located was on the property of the railroads. They could maintain this property in such a way as to permit persons to come on their property with vehicles

and on foot in order to deal with the railroads in their business as common carriers. Clearly, the railroads have the right to erect a barricade across their property in order to prevent persons from driving on to their tracks. On this barricade there was a reflector which the driver of the automobile in question would be bound to see if he were looking. We cannot perceive how the railroads can be held liable for doing that which they had a right to do.

Defendants also contend that the court erred in not granting them a new trial on the ground of newly discovered evidence. When the plaintiff was testifying she was asked as to whether she knew the whereabouts of Ann Warchol, the girl who was plaintiff's companion on the night of the accident. She answered in the negative. The uncontradicted affidavits of Helen and Ann Warchol show that on the night of February 11, 1940, plaintiff and her mother talked with Ann at Ann's home. This was 2 days before the trial started. About the time of the trial an agent of defendant attempted to locate Ann. He discovered that she had moved and he was unable to locate her. From the affidavit it appears that had Ann Warchol appeared as a witness she would have testified that after picking up the girls, Stanley Jakubcyk and Casimer Francus had two glasses of beer, and that before the accident she saw the barricade plainly; that the reflector on the barricade showed a ''bright red glow'' and that she called this to the driver's attention. The affidavit presented on the motion for a new trial also swore that plaintiff had been in touch with Ann all along, and on the evening of February 11, 1940, 2 days before the trial commenced, plaintiff's mother and a man called on her and asked her to appear as a witness, and that she, Ann, stated that she would ''but that her testimony would be truth.'' In view of the nature of the testimony which was introduced to support plaintiff's case, we are of the opinion that in any event the court should

have granted a new trial, based on the deliberate concealment by plaintiff of the whereabouts of the witness.

It is unnecessary to extend this opinion by a consideration of other points that are raised. From a careful consideration of the law and the evidence, we are of the opinion that it was the duty of the court to enter a judgment notwithstanding the verdict. Therefore, the judgment of the circuit court of Cook county is reversed and judgment entered here for the defendants and against plaintiff for costs.

*Judgment reversed and judgment here.*

HEBEL, P. J., and DENIS E. SULLIVAN, J., concur.