WILLIAM S. ROMANO, Plaintiff-Appellee, v. FORREST BITTNER, Defendant (Kent Shodeen, d/b/a Shodeen Construction Company, Defendant-Appellant).

Second District   No. 2—86—0526

———

Opinion filed June 10, 1987.

16

Lloyd E. Dyer, Jr., and Mountcastle & DaRosa, P.C., both of Wheaton, for appellant.

Robert S. Kramer, of Ariano, Anderson, Bazos, Hardy, Kramer & Castillo, P.C., of Elgin, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Kent Shodeen d/b/a Shodeen Construction Company (Shodeen), appeals from the judgment of the circuit court of Kane County denying his pretrial motions to dismiss and for summary judgment and his post-trial motions for directed verdict and judgment notwithstanding the verdict. The cause arose after an automobile acci-

dent between the plaintiff, William Romano, and defendant Forrest Bittner, which occurred in defendant Shodeen's parking lot. The jury found against both defendants on the plaintiff's complaint. It found plaintiff's total damages were $56,000 and that plaintiff's comparative negligence was 20%, thus allowing him a total recovery of $44,800. The jury awarded Shodeen $15,680 on his contribution counterclaim against Bittner, and it awarded Bittner nothing on his contribution counterclaim against Shodeen.

The accident occurred in the parking lot of the Jewel-Osco store located at the northeast corner of the intersection of Route 38 and Randall Road in St. Charles on February 8, 1980. The plaintiff, William Romano, had just exited from Route 38 into the parking lot and was traveling in a northerly direction in the lot when he was struck in an intersection of the lot by a pickup truck driven by defendant Forrest Bittner. The intersection was an open one, with no traffic control devices. Bittner was traveling east at the time of the collision. Shodeen is the beneficial owner of the lot where the accident occurred, and he also is the general contractor who managed construction of the lot and the Jewel-Osco store.

Romano had been traveling westbound on Route 38 on his way home from work before he turned into the lot. He had been in the lot two days before when the store first opened, and he intended to stop at Jewel to purchase flowers. Following the striped, curved ingress lane, Romano made a right turn off Route 38 into the parking lot and proceeded north. Romano stated he accelerated to about five to eight miles per hour just prior to the accident. He collided with Bittner 76 feet north of Route 38 where the "quasi-roadway" on which Bittner was traveling intersected with Romano's roadway.

From the time he turned into the lot, Romano had a clear view of the intersection, and the pavement was dry. He looked straight ahead as he approached the intersection and also looked for traffic coming from the right. He did not look to the left until he was halfway into the intersection. At that time, he saw Bittner's truck approaching from the left. He estimated that Bittner's truck was six to eight feet away from him and traveling about 25 to 35 miles per hour when he first saw it. Romano stated he accelerated to avoid a collision; however, the left front of Bittner's truck struck the left rear quarter of Romano's car, spun it around 180 degrees, and pushed it one to two car lengths north of the intersection.

Bittner was on his way home after shopping at Jewel when the collision occurred. From his parking space in front of Jewel, Bittner proceeded west to the first southerly road. He turned and drove south

20

along the roadway which ran parallel with the outside edge of the parking area and which ultimately curved to the east. Bittner felt there was less traffic and congestion by going that way. The entrance into the lot which Romano used was designed to permit right turns only for westbound traffic entering or exiting the lot at that point. There was a stop sign for traffic exiting the lot to go westbound on Route 38. Traffic entering the lot from westbound Route 38, as plaintiff was, was not controlled by any traffic signs. The entry roadway was intersected to the north first, by the east-west roadway on which Bittner was traveling, and second, in a "T" fashion by a roadway from the east about 90 feet north of the first intersection. Traffic on those two intersecting roads was not controlled by any traffic signals. Bittner intended to proceed east past the entry roadway on which Romano was traveling to the next entrance which was described in the record as the "main entrance." Further to the north of the "T" intersection with the entry roadway, two stop signs controlled traffic on the roadway which intersected the entry roadway in a northeast to southwest direction at the south corner of the Jewel-Osco store. At that point by the corner of the store, the direction of the entry roadway changed from due north to northwest and continued on parallel with the front of the Jewel-Osco store.

Bittner first observed Romano's car when Bittner turned onto the east-west roadway. At that time, Romano was beginning to turn off Route 38 into the parking lot. Bittner estimated he was 120 feet from the intersection when he first saw Romano's car, and his own speed was 10 to 15 miles per hour.

Bittner took his foot off the gas when he first saw Romano, but he did not apply his brakes. He first applied his brakes about 10 to 25 feet from the intersection, when he felt a collision was "imminent." Bittner continued to observe Romano's vehicle, and it was apparent from the time he first saw it that it would cross his path. About 10 seconds elapsed from the time he first saw Romano's vehicle until impact. As Bittner approached the intersection, he reached down and flashed his lights on and off but did not sound his horn. Nothing obstructed his view of the intersection. There was a vacant lot to the east and south of the intersection at the time of the occurrence.

Bittner testified that Romano did not look in his direction until just before impact. When he did look, Romano seemed surprised and applied his brakes. Bittner stated that if he had applied his brakes sooner or if Romano had speeded up there would not have been a collision.

Kent Shodeen testified that he was the sole owner as beneficiary

of a land trust of the portion of the lot involved in the occurrence on February 8, 1980. He also was the general contractor of the "Jewel-Osco Project" which occupies the western 8.3 acres of the shopping center and which was completed in early February 1980. As a general contractor and developer, he has built numerous other commercial projects in the Kane County area.

To prepare the Jewel-Osco project, he retained a professional engineering consultant, Paul Box & Associates, to perform traffic studies and to comply with State Department of Transportation and city of St. Charles regulations. He also retained a civil engineering firm, Ziemet-Wozniak, which prepared the engineering site planning which was admitted in evidence.

Although in his deposition testimony he stated he believed the plans called for a stop sign at the intersection in question, he testified at trial no site plan was available to him at that time, and he was confused about which intersection was being discussed. After reviewing the site plans, he testified at trial that the plans did not call for stop signs at the intersection where the collision occurred, nor did they call for markings on the pavement at the intersection to indicate traffic was to stop. The cost of a stop sign with installation would be about $200. All plans were submitted to and approved by the Illinois Department of Transportation, the State of Illinois, and the city of St. Charles. Shodeen testified, however, that the city of St. Charles has no traffic control code for private property. The concern of the State and the Illinois Department of Transportation is with the means of ingress and egress from major thoroughfares.

Shodeen was involved in the planning and construction of the lot. He stated that his understanding of the purpose of placing signs in other portions of the lot was to meet the requirement that there be a stop sign at an entry to a major thoroughfare or to avoid a problem at a blind corner within the lot where vision was obstructed. The intersection where the accident occurred was clear and open. Under his lease with Jewel-Osco, Shodeen is responsible for cleaning, lighting, landscaping, snow removal and other general maintenance of the lot or the subcontracting therefore. The two roadways which formed the intersection in question were similar but not identical to other roadways in the parking lot where traffic control devices were installed. Shodeen testified that parking aisles, *i.e.*, rows of parked cars, funneled about 50% of the cars which were parked to the east-west roadway on which Bittner was traveling at the time of the collision.

Shodeen attempted to call Paul Box, the consulting engineer, as a witness. Box was not permitted to testify, however, because he had

not been disclosed as a witness sufficiently in advance of trial, and an offer of proof was made.

■■ Shodeen first contends plaintiff failed to allege and prove the existence of a duty owed by him to plaintiff and that the court erred in denying his pre- and post-trial motions for dismissal, summary judgment, directed verdict, and judgment *n.o.v.* based on this absence of duty.

Initially we note it has been held that the denial of a motion for summary judgment is not reviewable on appeal after an evidentiary trial because any error in the denial merges into the subsequent trial. (*Banwart v. Okesson* (1980), 83 Ill. App. 3d 222, 225; see also *International Association of Machinists and Aerospace Workers, District Lodge No. 140 v. Cheshire/A Xerox Co.* (1984), 125 Ill. App. 3d 350, 352; *Chicago Title & Trust Co. v. First Arlington National Bank* (1983), 118 Ill. App. 3d 401, 411-12.) "The rationale for the merger doctrine is that it would be unjust for a verdict reached after trial, where the evidence was completely presented to the trier of fact and subject to cross-examination, to be overturned on less evidence, that is, evidence obtained only from the pleadings and affidavits." (*Paulson v. Suson* (1981), 97 Ill. App. 3d 326, 328.) Accordingly, we give no consideration to Shodeen's contention in this regard.

■■■ Next, relying on *Gray v. City of Plano* (1986), 141 Ill. App. 3d 575, and *Burnett v. Donath* (1984), 127 Ill. App. 3d 131, Shodeen contends Romano's second amended complaint contains conclusions only, as opposed to facts; thus, Romano has failed to state a cause of action and dismissal of the complaint was required.

For purposes of review, a motion to dismiss admits all well-pleaded facts (*Mack v. Plaza DeWitt Ltd. Partnership* (1985), 137 Ill. App. 3d 343, 349), and all reasonable inferences are drawn in favor of the opponent (*Bagel v. American Honda Motor Co.* (1985), 132 Ill. App. 3d 82); the court ignores conclusions of law or conclusions of fact unsupported by allegations of specific facts upon which such conclusions rest (*Doyle v. Shlensky* (1983), 120 Ill. App. 3d 807). Factual conclusions based on previously alleged facts, however, may be considered in determining whether a proper factual basis for a cause of action is alleged. *Segall v. Berkson* (1985), 139 Ill. App. 3d 325, 328.

■■■ In a cause of action alleging negligence, a plaintiff must establish the existence of a duty, a breach of that duty, and an injury proximately resulting from the breach of that duty. (*Williams v. McCoy* (1987), 152 Ill. App. 3d 912, 913; *Duncan v. Rzonca* (1985), 133 Ill. App. 3d 184, 187.) It is not sufficient that a complaint merely allege a duty; the plaintiff must allege facts from which the law will

raise a duty. (133 Ill. App. 3d 184, 187; *Bescor, Inc. v. Chicago Title & Trust Co.* (1983), 113 Ill. App. 3d 65.) The existence of a legal duty is a question of law to be determined by the trial court. *Duncavage v. Allen* (1986), 147 Ill. App. 3d 88, 96.

■■■ The court's determination of the existence of a legal duty involves complex considerations of legal and social policies (*Duncan v. Rzonca* (1985), 133 Ill. App. 3d 184, 192), including the foreseeability and likelihood of the injury, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden upon the defendant. (*Zimmermann v. Netemeyer* (1984), 122 Ill. App. 3d 1042, 1055; *Morgan v. Dalton Management Co.* (1983), 117 Ill. App. 3d 815, 818.) Unless it clearly appears that no set of facts can be proved under the pleadings which would entitle the plaintiff to recover, the complaint should not be dismissed. (*City of Chicago v. Department of Human Rights* (1986), 141 Ill. App. 3d 165; *Panorama of Homes, Inc. v. Catholic Foreign Mission Society, Inc.* (1980), 84 Ill. App. 3d 142.) In order to withstand a motion to dismiss, the plaintiff need not set forth evidence which may well be derived from discovery subsequent to filing of the complaint (*Wolinsky v. Kadison* (1983), 114 Ill. App. 3d 527), and no pleading is bad in substance which contains such information as reasonably informs the opposite party of the nature of the claim or defense which he or she is called upon to meet (Ill. Rev. Stat. 1985, ch. 110, par. 2—612(b)).

■■ We find the plaintiff's second amended complaint here sufficiently stated a cause of action in negligence against the defendant and that the court did not err in refusing to dismiss it.

Unlike the complaint in *Gray* which contained the bare allegation that the defendant had a duty not to injure the plaintiff (*Gray v. City of Plano* (1986), 141 Ill. App. 3d 575, 577), the second amended complaint at bar alleged defendant had a duty to maintain the lot in a reasonably safe condition so as to not negligently cause injuries, a duty to exercise reasonable care to control the conduct of others using the parking lot so as to not negligently cause injury to others using the lot, and a duty to properly mark the surface of the lot with designated roadways to control the flow of traffic when it was reasonably foreseeable that the failure to do so would create a hazardous driving condition for business invitees using the lot. The instant second amended complaint is also distinguished from the one considered in *Burnett v. Donath* (1984), 127 Ill. App. 3d 131. In that case, the court found in dismissing the plaintiff's amended complaint that there were no facts alleged which would indicate, by inference or otherwise, that the provision of turning lanes by the city would have prevented

the accident which occurred there. In contrast here, it may be inferred that Shodeen's compliance with the duties alleged with regard to the parking area could have prevented the accident since, at the least, Bittner's failure to "keep a proper look out for traffic approaching from a lateral direction" (which included the plaintiff) may have been obviated thereby. Accordingly, we conclude the court did not err in denying the defendant's motion to dismiss.

We also conclude the court did not err in denying defendant's motions for a directed verdict and for judgment *n.o.v.*.

In deciding whether to direct a verdict or to enter judgment *n.o.v.* it is incumbent upon the trial court to apply the standard enunciated by the supreme court in *Pedrick v. Peoria & Eastern R.R. Co.* to the particular facts at bar. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494; *Sandberg-Schiller v. Rosello* (1983), 119 Ill. App. 3d 318.) That is, verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Barreto v. City of Waukegan* (1985), 133 Ill. App. 3d 119; *Ashby v. Price* (1983), 112 Ill. App. 3d 114.) The appellate standard for determining whether the trial court erred in denying motions for directed verdict and judgment *n.o.v.* is this same test. *Hollembaek v. Dominick's Finer Foods, Inc.* (1985), 137 Ill. App. 3d 773.

A court properly directs a verdict when the opposing party has failed to produce some required element of proof in support of its cause of action. (*Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42.) However, where the evidence demonstrates a substantial factual dispute, or where the assessment of the credibility of witnesses or a determination regarding conflicting evidence may be decisive of the outcome, it is error to direct a verdict or enter judgment *n.o.v.* (*Wright v. Yellow Cab Co.* (1983), 116 Ill. App. 3d 242.) A trial court's decision denying a directed verdict or a judgment *n.o.v.* will be overturned only where that decision is contrary to the manifest weight of the evidence. *Roeseke v. Pryor* (1987), 152 Ill. App. 3d 771, 777.

Shodeen argues that the facts of the case, considered in light of the duty owed to a business invitee as set forth in the Restatement (Second) of Torts (Restatement (Second) of Torts secs. 343, 343A (1965)) and as discussed in *Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, and *Longnecker v. Illinois Power Co.* (1978), 64 Ill. App. 3d 634, shows there was no duty owed as alleged by plaintiff. He further relies on *Sepesy v. Archer Daniels Midland Co.* (1981), 97

Ill. App. 3d 868, and *Flowers v. K-Mart Corp.* (1980), 126 Ariz. 495, 616 P.2d 955, in support of his argument that he had no duty to install signs or take other precautions in order to warn the plaintiff of a condition that was open and obvious.

The parties here agree that plaintiff was a business invitee. Although the Premises Liability Act has abolished the common law distinction between invitees and licensees with regard to the duty owed by a property owner to entrants, that act became effective September 12, 1984, and it is not retroactively applicable to this cause. (Ill. Rev. Stat. 1985, ch. 80, par. 301 *et seq.*; *Grimwood v. Tabor Grain Co.* (1985), 130 Ill. App. 3d 708, 711.) Generally, the difference in the duty owed was that while a landowner must exercise reasonable care for the safety of an invitee, the landowner must only refrain from wilfully and wantonly injuring a licensee or a trespasser. (*Trout v. Bank of Belleville* (1976), 36 Ill. App. 3d 83.) Thus, it has been recognized that the owner of business property has a duty to exercise reasonable care to keep property reasonably safe for the use of a customer (*Koehler v. Great Atlantic & Pacific Tea Co.* (1967), 90 Ill. App. 2d 458), and to discover defects and dangerous conditions existing on the premises and to either correct those dangers or to give sufficient warning of them. (*Chapman v. Foggy* (1978), 59 Ill. App. 3d 552.) "A business invitee is responsible for his safety and must be held equally aware of all obvious and normal hazards incident to the premises as the possessor of land. The liability of the possessor of land is predicated on his failure to expect that his invitee will not discover or realize the danger. *Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 468-69, 343 N.E.2d 465." *Fisher v. Crippen* (1986), 144 Ill. App. 3d 239, 244.

Both parties believe sections 343 and 343A of the Restatement are supportive of their arguments. (Restatement (Second) of Torts secs. 343, 343A (1965).) Section 343 provides:

"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger."

Section 343A provides:

"A possessor of land is not liable to his invitees for physical

harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated."

■■■ Shodeen argues there is no evidence of a condition which imposes an "unreasonable risk of harm" and, even if there had been some proof that the intersection posed an unreasonable risk of harm, there would still be no duty to install traffic control devices because the dangers of an open intersection are obvious to everyone. Shodeen further argues there was no evidence presented which would make either of the two examples given in paragraph f of the comment on subsection (1) of section 343A of the Restatement applicable. In pertinent part, paragraph f provides:

"There are, however, cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger. ***

Such reason to expect harm to the visitor from known or obvious dangers may arise, for example, [1] *where the possessor has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it.* Such reason may also arise [2] *where the possessor has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk.*" (Emphasis added.) Restatement (Second) of Torts sec. 343A, Comment *f,* at 220 (1965).

Plaintiff argues that it is exactly the first of these examples which applies here since Shodeen would have reason to expect that a customer's attention would be distracted as he came into the store parking lot and headed toward the store looking for a parking place and pedestrians. Plaintiff asserts: "There are few places more distracting than a grocery store parking lot."

Although anyone who has ever been in a grocery store parking lot might well be inclined to agree with plaintiff's assertion, it is nonetheless true, as Shodeen points out, that the record is devoid of the exist-

ence of any such distractions. Moreover, it appears there were no stores immediately adjacent to either side of the roadway on which the plaintiff was traveling, nor were any parking spaces immediately accessible from the roadway since it had curbs on both sides.

Although we find no evidence the plaintiff was distracted, we nevertheless find the evidence presented did not so overwhelmingly favor Shodeen that no contrary verdict could ever stand. Based on the evidence presented and the physical layout of the site, we believe a jury could reasonably conclude that Shodeen could or should have anticipated that the plaintiff would fail to appreciate the danger presented by the intersection and fail to protect himself against it.

During trial, various terms such as "roadway," "quasi-roadway," and "aisle" were used to describe the passageways in the parking lot, such terms relating to the volume of traffic on the passageway, whether the passageway played a role in the maneuvers incident to parking a car, whether they were straightaways, and so forth. Although the entrance plaintiff used was not described as the "main entrance," it clearly was the only direct route to the Jewel-Osco for traffic westbound on Route 38. The actual turn from Route 38 into the entry roadway was not a right-angle turn, but a soft curve to the right, thus inviting a sweeping turn into the due-north straightaway which would necessitate only a slight reduction in speed. The curbs on either side of this entry roadway, and the stop signs for traffic on the roadway intersecting at the south corner of the Jewel-Osco building, could have caused the plaintiff to reasonably believe that he had a safe and express passage to the customer parking area in front of the Jewel-Osco store. Shodeen himself described the roadway on which Bittner was traveling as a "quasi-roadway" as opposed to the one plaintiff was on which Shodeen described as a "roadway." Plaintiff could reasonably have believed he was on a priority-type of roadway, and his appreciation of the danger presented by any cross-traffic would likely have been substantially dulled by his sense of security, albeit a false one.

We find the facts of the instant cause distinguish it from the cases relied on by Shodeen, *Sepesy v. Archer Daniels Midland Co.* (1981), 97 Ill. App. 3d 868, and *Flowers v. K mart Corp.* (1980), 126 Ariz. 495, 616 P. 2d 955. In *Sepesy*, plaintiff's decedent was killed when he was struck by a truck which rolled down an incline on defendant's property. There were no intersecting roadways in *Sepesy*, and no evidence was presented which could have been viewed as having lessened the obvious danger of the incline. In *Flowers*, the plaintiffs were struck by a car as they attempted to cross the driveway in the park-

ing lot owned by K mart. Plaintiffs alleged that K mart breached its duty to provide a crosswalk for their use. The road on which the plaintiffs there were injured was between the K mart store and its parking lot. It was described as a driveway which ran east and west, parallel to the front of the store. It was wide enough for three cars to pass alongside one another, and the parking aisles all intersected with the driveway at right angles. The court there agreed with K mart that the layout of its parking lot and the traffic therein was an open and obvious condition. Unlike the case at bar, however, there was no evidence which would have sustained a finding that K mart could or should reasonably have anticipated that the plaintiffs would fail to protect themselves from the obvious danger presented by the roadway and the traffic thereon.

Accordingly, we conclude the court did not err in denying Shodeen's motions for directed verdict and judgment *n.o.v.*

■■ Shodeen next contends that even if a duty existed, any alleged negligence on his part did nothing more than create a condition which made the injury possible and that it was the subsequent independent acts of the plaintiff and Bittner which caused the injury, thus breaking any causal connection between his alleged negligence and plaintiff's injury. He relies on *Jeanguenat v. Zibert* (1979), 78 Ill. App. 3d 948, and *Boylan v. Martindale* (1982), 103 Ill. App. 3d 335, in support of his argument that the subsequent acts of Romano and Bittner in failing to observe a danger which was clearly visible could not reasonably have been anticipated.

The parties agree that the question of proximate cause in a negligence case is generally one for the jury to decide. (*Felty v. New Berlin Transit, Inc.* (1978), 71 Ill. 2d 126; *Merlo v. Public Service Co.* (1942), 381 Ill. 300; *Garrett v. Grant School District No. 124* (1985), 139 Ill. App. 3d 569.) We add that the jury's finding in a negligence action should not be disturbed on appeal unless the opposite conclusion is clearly evident or its finding is unreasonable, arbitrary, and not based on the evidence. *Sewell v. Wofford* (1985), 131 Ill. App. 3d 62.

■■ ■ With regard to a third party's acts, the subsequent act of a third party does not break the causal connection between a defendant's negligence and a plaintiff's injury where that subsequent act was probable and foreseeable. (*Roeseke v. Pryor* (1987), 152 Ill. App. 3d 771, 779.) The test for determining whether a defendant's acts or omissions were a proximate cause of the plaintiff's injury is whether the defendant, as the first wrongdoer, should reasonably have foreseen the intervening cause as a natural and probable result of his negligence. (*Seith v. Commonwealth Electric Co.* (1909), 241 Ill. 252, 259;

*Filipetto v. Village of Wilmette* (1985), 135 Ill. App. 3d 781.) In order to escape liability, a defendant must demonstrate that the third party's act was unforeseeable as a matter of law. *Roeseke v. Pryor* (1987), 152 Ill. App. 3d 771, 779.

Romano distinguishes *Jeanguenat* and *Briske v. Village of Burnham* (1942), 379 Ill. 193, also cited by Shodeen, on the basis those cases involved accidents with stationary objects which were plainly visible and should have been seen but for the driver's inattention. (*Jeanguenat v. Zibert* (1979), 78 Ill. App. 3d 948 (a parked car); *Briske v. Village of Burnham* (1942), 379 Ill. 193 (a black-and-white striped barricade with a large red reflector).) He argues that although his view of the intersection here was clear, the accident involved not only seeing the vehicle, but also anticipating the actions of a driver of a moving object. He asserts that defendant Shodeen's conduct in placing stop signs at similar intersections within the parking lot shows the fact that a collision actually did occur was not an intervening cause breaking the causal connection, but, rather, a happening which reasonable men would or should have foreseen.

Romano points to *Young v. Gateway Transportation Co.* (1975), 26 Ill. App. 3d 864, where the court's refusal to direct a verdict or enter judgment *n.o.v.* was affirmed. In so refusing, the court rejected the defendant's contention that his truck, which was left standing in a moving lane of traffic, was merely a condition and that it was the negligent conduct of the driver of the vehicle which collided with the truck which was the sole cause of the accident. Defendant's position there was that the immobility of the truck could only be an object that is acted upon. The court stated, however, "It is a fundamental proposition in the law of negligence that there may be more than one proximate cause of an injury and that one is liable for its negligent conduct whether it contributed in whole or in part to a plaintiff's injury, so long as it was one of the proximate causes of the injury. [Citation.]" *Young v. Gateway Transportation Co.* (1975), 26 Ill. App. 3d 864, 872.

In *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 317, the court had this to say about intervening efficient causes:

"If the act of a third party is the immediate cause of the injury and is such as in the exercise of reasonable diligence would not be anticipated and the third person is not under the control of the one guilty of the original wrong, the connection is broken and the first act or omission is not the proximate cause of the injury. There may be more than one proximate cause of an injury. But if two wholly independent acts, by independent par-

ties, neither bearing to the other any relation or control, cause an injury by one creating the occasion or condition upon which the other operates, the act or omission which places the dangerous agency in operation is the efficient intervening cause that breaks the causal connection and makes the other act or omission the remote and not the proximate cause of the injury."

In the instant case, the negligence apparently was not due strictly to what may be termed the drivers' "inattention." Rather, on Bittner's part, it was the failure to avoid the collision. Bittner admitted he saw Romano's car when it turned off Roosevelt, and that he flashed his lights at Romano, but that he did not apply his brakes until the collision was "imminent." There was conflicting evidence as to how fast Bittner may have been traveling (anywhere from 10 to 15 miles per hour to 25 to 30 miles per hour), and there was evidence of skid marks four to five feet in length. On Romano's part, the negligence appears to have been that he did not look to his left in time or moderate the movement of his vehicle in such a manner so as to have been able to avoid a collision if indeed there was any traffic coming from the left. There was also conflicting evidence as to whether Romano accelerated or braked just before the collision.

It is reasonably inferable from the evidence of Bittner's actions that he felt Romano either should or would yield the right-of-way to him. Romano's actions similarly evidenced a priority attitude, at least insofar as traffic approaching from the left. Romano turned into the lot and began to accelerate. He looked straight ahead, then to the right, and only then to his left, whereupon he saw Bittner's truck approximately six to eight feet away, moving at a speed which, after the collision, prompted Romano's first words to be: "Why in the world were you going so fast?" Bittner did not acknowledge during trial to knowing the "Rules of the Road" provision that at an intersection, the driver of a vehicle on the left must yield the right-of-way to the vehicle on the right. Ill. Rev. Stat. 1985, ch. 95½, par. 11—901.

Based on the above, we believe it may reasonably be inferred that there was confusion about who had the right-of-way. Moreover, we believe it cannot be said as a matter of law that Bittner, as the driver on the left, should have yielded to Romano as the driver on the right. First, the yield provision of section 11—901 of the Illinois Rules of the Road (the rules) (Ill. Rev. Stat. 1985, ch. 95½, par. 11—901) does not grant an *absolute* right-of-way to the driver on the right (*Duffek v. Vanderhei* (1980), 81 Ill. App. 3d 1078), and, in fact, such provision is modified at "through" highways (Ill. Rev. Stat. 1985, ch. 95½ par.

11—901(b)). Second, this collision occurred on privately maintained property. Section 11—201 of the rules provides in pertinent part: "The provisions of this chapter [95½] relating to the operation of vehicles refer exclusively to the operation of vehicles upon *highways* ***." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 95½, par. 11—201.) "Highway" is defined in pertinent part as: "The entire width between the boundary lines of every way *publicly* maintained ***." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 95½, par. 1—126.) Consequently, the yield provisions of the rules are not applicable *per se* to this parking lot. Moreover, there is no evidence in the record of any contract with the city of St. Charles which would have empowered it to regulate the parking and traffic at the shopping center as provided for in section 11—209 (Ill. Rev. Stat. 1985, ch. 95½, par. 11—209).

We also believe it may reasonably be inferred that this confusion over right-of-way, at least in part, was created by the lack of appropriate traffic controls or warnings in light of the physical configurations of the lot. In this respect, the instant cause is distinguished from *Boylan v. Martindale* (1982), 103 Ill. App. 3d 335, wherein we found the alleged failure of the city to clear trees and bushes from the area adjacent to the intersection controlled by a visible, operating traffic signal was not a contributing factor to the plaintiff's injury. There were no traffic controls at the intersection in question here, although other similar, but not identical, intersections in the lot had stop signs. The ramifications of the distinction between aisles, quasi-roadways and roadways which were recognized by Shodeen apparently were not as obvious to motorists using the lot. Moreover, as intervening efficient causes were discussed in *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 317, it would appear that Shodeen's alleged negligent acts or omissions bore some degree of "relation or control" to Bittner's acts since Bittner was traveling within perimeters defined by Shodeen.

Based on the evidence, we cannot say that the negligence alleged against Shodeen did not to some degree contribute to the plaintiff's injury. We caution that our opinion here certainly must not be construed to require traffic controls or warnings at all parking lot intersections. We simply find that, based on the particular facts of this case, a conclusion opposite to that one reached by the jury here is not clearly evident and that its finding was not unreasonably arbitrary and was based on the evidence. Accordingly, the jury's verdict will not be disturbed.

We find no merit in Shodeen's next argument which is, as plaintiff has characterized it, "less than clear." His contention appar-

ently is that he was seriously prejudiced when the jury was allowed to decide both issues of proximate cause and breach of duty while also permitting it to allocate percentages of damages without first explaining the consequences of its decision, namely, that the percentages of damages it awards may never be enforced due to the doctrine of joint and several liability. Shodeen cites no authority in support of his contention, nor does he point to any efforts he may have made during trial to have the jury instructed assuming, for the sake of argument, that such instruction would have been proper. Moreover, the issue as raised in his post-trial motion was that "AN ACT in relation to contribution among joint tortfeasors" (Ill. Rev. Stat 1985, ch. 70, par. 301 *et seq.*) is unconstitutional; however, he offers no argument or authority on that issue. The failure to support theories or contentions with citations to relevant supporting authority constitutes a waiver of the issue. *In re Marriage of Anderson* (1985), 130 Ill. App. 3d 684; *Kavanaugh v. Estate of Dobrowolski* (1980), 86 Ill. App. 3d 33.

The only "relevant" case cited by Shodeen is *Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, which he argues is "not effective under the facts of this case." To the contrary, however, the supreme court in *Coney* decisively retained the doctrine of joint and several liability despite the argument that with the adoption of comparative negligence, it was no longer rational to hold a defendant liable beyond his share of the total damages. (*Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 119-124.) Shodeen's argument that joint and several liability should not be applied in this case because the "culpability of the plaintiff in this case was found to exceed that of Shodeen" is a misconstruction of the nature of the plaintiff's culpability as opposed to that of a defendant whose conduct is found to be a proximate cause of the plaintiff's injury. As noted in *Coney*:

> "Even in cases where the plaintiff is partially at fault, his culpability is not equivalent to that of a defendant. *The plaintiff's negligence relates only to a lack of due care for his own safety while the defendant's negligence relates to a lack of due care for the safety of others; the latter is tortious, but the former is not.*" (Emphasis added.) *Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 122.

We likewise find no merit in Shodeen's final contention that the court erred in refusing to permit him to call Paul Box, a professional traffic engineering consultant, as an expert witness. Shodeen cites *Lindley v. St. Mary's Hospital* (1980), 85 Ill. App. 3d 559, in support of his assertion that the judgment should be reversed, but he does not explain in what way Box's testimony was "extremely im-

portant" to his defense or how he was prejudiced by its exclusion.

In *Lindley*, the trial court prevented the plaintiff's expert witness from testifying because the defendant had not been informed of the existence of the expert witness prior to trial. This was found on appeal to be an abuse of the court's discretion, however, where no motion under section 58(3) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 58(3), currently codified as Ill. Rev. Stat. 1985, ch. 110, par. 2—1003(c)) had been made for the disclosure of such expert.

Plaintiff here correctly distinguishes *Lindley* on the basis he did make such a request for disclosure of expert witnesses in 1981, shortly after the case was filed, and, further, the court entered an order cutting off discovery in 1984 prior to the pretrial conference.

Although trial did not commence until March 1986 and, as noted previously, Paul Box was one of the consulting engineers engaged during the construction of the lot, Shodeen did not notify plaintiff of his intent to call Box as an expert witness until trial had already commenced. Counsel for Shodeen asserted during argument that they had "just retained" Box on Tuesday, which apparently was the day before the trial began.

After further argument, the court entered its order barring Box from testifying at trial as an expert witness, but allowing him to be interrogated as an ordinary witness. We note the basis for the court's decision was not Supreme Court Rule 220. That rule, effective October 1, 1984, was enacted in order to establish a uniform but flexible framework for the timely revelation of the identity of expert witnesses and the subject matter of their testimony. (103 Ill. 2d R. 220.) Instead, it appears the operative rule was section 2—1003(c) of the Civil Practice Law (Ill. Rev. Stat. 1985, ch. 110, par. 2—1003(c)). Accordingly, in determining whether to exclude Box's testimony as a sanction, the court considered the factors set forth in *Ashford v. Ziemann* (1984), 99 Ill. 2d 353, 369, citing to *Kirkwood v. Checker Taxi Co.* (1973), 12 Ill. App. 3d 129, 132:

" 'We believe it to be well established that there are a number of factors to be considered in determining whether the exclusion of a witness is an appropriate sanction to impose when her name has not been furnished. Among the factors our courts have considered are: the surprise to the adverse party, the prejudicial effect of the testimony, the nature of the testimony, the diligence of the adverse party, the timely objection to the testimony and the good faith of the party calling the witness.' "

It was the court's opinion that the surprise to the plaintiff here

was apparent, that plaintiff had been sufficiently diligent in attempting to discover defendant's witnesses, and that plaintiff had made a timely objection to the testimony. After receiving defendant's narrative offer of proof, the court determined Box's proposed testimony would be significantly prejudicial to the plaintiff since "he obviously would have wanted to test it, [and] have his own experts and so on." The court also opined that a portion of Box's testimony took on aspects of reconstruction testimony which probably would have been the subject of a motion during the course of such testimony.

The decision to allow or exclude expert testimony is a matter within the sound discretion of the trial court (*Appelgren v. Walsh* (1985), 136 Ill. App. 3d 700, 703), and a reviewing court will not interfere with the trial court's ruling unless there has been a manifest abuse of discretion (*Dobbs v. Safeway Insurance Co.* (1978), 66 Ill. App. 3d 400) which the appellant must clearly show (*Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc.* (1978), 61 Ill. App. 3d 636). We find appellant has failed to make such a showing here.

Accordingly, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

LINDBERG, P.J., and REINHARD, J., concur.